**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Edward Craig; Poole, et al.,
Petitioners,
v.
John M. Roll, et al.,
Defendants.

Civil Action No. 1:07-cv-02039 RJL

**MOTION TO QUASH DEFENDANT GARNETT THOMAS EISELE'S MOTION TO DISMISS**

1) Comes now Petitioner, Wendell-David; Williams, a layman, **Haines v. Kerner**, 404 US 519, 30 L.Ed.2d 652, 653 headnotes 1 & 2; **Hughes v. Rowe**, 449 US 5, 10, 66 L.Ed.2d 163, 170 n.7 (1980); **Warren v. District of Columbia**, 353 F.3d 36, 37 (D.C. Cir., 2004).

2) On or about 12 December 2007, Defendant Eisele filed a motion to dismiss himself from cause number 1:07-cv-02039 for the following reasons:

a) Defendant Eisele states that "Petitioners Complaint Fails to State a Claim";

b) Defendant Eisele states that "Petitioners Complaint is Barred By Judicial Immunity";

c) Defendant Eisele states that "This Court Should Dismiss for Lack of Personal Jurisdiction and Improper Venue".

3) These Petitioners have checked the statutes and case law on these issues and find that Defendant Eisele has not done his research well enough or has only stated parts of the truth and not the whole truth. The Petitioners point out to this Honorable Court that Defendant Eisele has in NO way or manner denied the claims brought against him and others and all he is tring to do is have this action dismissed for the sole purpose of not having to answer the claims against him. The Claims against these named Defendants as well as all those yet unnamed are clearly stated in the petitioners R.I.C.O. Claim.

RECEIVED

JAN 10 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

4) In answer to Defendant Eisele's first claim that "Petitioners Complaint Fails to State a Claim", the petitioners state the following:

A) Various methods have been used to dismiss the petitioners "Petition's" hoping that we would just give up and stay silent ie. (Procedural Morass) which includes the following:

1) Not having proper filing fees;
2) Not using a Court approved Form;
3) Not stating a Constitutional Claim;
4) Stating facts that are proven to be untrue or not the complete truth;
5) Intimidation because we are uneducated in law;
6) Threats

The petitioners are laymen all, and as such are not required to use the same artful formats that are required of the law profession, see:
**Hughes v. Rowe**, supra, at 449 US 10 (Exhibit A-1)
**Haines v. Kerner**, supra, at 404 US 519 (Exhibit A-2)
**Gale v. U.S. Dept. of Justice, Fed. Bur. of Prisons**, 628 F.2d 224, 226 (D.C. Cir., 1980) (Exhibit A-3)
Therefore, with the procedural morass, the petitioners Constitutional Rights to Habeas Corpus have been hendered.

5) In answer to Defendant Eisele's second Claim that "Petitioners Complaint is Barred by Judicial Immunity", the petitioners do not dispute that Defendant Eisele has judicial immunity to a certain degree, however he is not immune from the criminal actions which are stated in the petitioners complaint. In support of this statement the petitioners state the following:

B) On page 4 of defendant Eisele's "Motion to Dismiss", he stated that "However, the Court noted that a judge is not absolutely immune from criminal liability, from a suit for prospective injunctive relief..." see (Exhibit B-1 & B-2). Furthermore, since defendant Eisele has entered into this Honorable Courts Record, the petitioners, Wendell-David; Williams, Civil Case File, the petitioners right to litigation in this action as well at the original cause can proceed. The Civil Cause is a challenge to the original action from 2003, which will show this Honorable Court the illegal actions that defendant Eisele committed in all of his orders. The pattern is clearly visable in both causes as well as all the petitioners causes and also with all the yet unnamed petitioners causes.

Since the petitioners Complaint is about criminal activities, all of the defendants named and as yet unnamed are **NOT BARRED BY JUDICIAL IMMUNITY.**

6) The third claim that defendant Eisele has stated is that "This Court Should Dismiss for Lack of Personal Jurisdiction and Improper Venue". To address this claim the petitioners look at the case law:

> C) A requirement for personal jurisdiction is simply to have "Minimum Contact". There is a 5 question test to see if minimum contact does in fact give a court personal jurisdiction. see **Wessels, Arnold & Henderson v. Nat. Medical Waste,** 65 F.3d 1427, 1432-1433 (8th Cir., 1995) (Exhibit C-1 & C-2);
>
> Defendant Eisele was appointed on 6 August 1970 by the President and confirmed by the Senate, both of which are in Washington, District of Columbia. While he is a Chief Judge, he is required to attend the "Judicial Conference" which again is held in Washington, District of Columbia. The defendant Eisele has Minimum Contact;
>
> Defendant Eisele is a member of the Corporation of the "United States of America" and as such he receives his paycheck from the United States Treasury which again is in Washington, District of Columbia. There is no doubt in the petitioners minds that defendant Eisele has in the past and is still in touch with Washington, District of Columbia through the United States Mail System, the internet and the use of the telephone system. All of these close ties to the "United States Corporation" gives the District Court for the District of Columbia Personal Jurisdiction over defendant Eisele.

7) Furthermore, for the petitioners to try and select a different court would mean that a conflict of interest would arise due to the fact that most of the Districts involved and those yet unnamed and the judges involved and those yet unnamed will cover most of the Districts of the United States however the petitioners will let this Honorable Court decide the proper venue for the petitioners Complaint and transfer it if necessary.

## CONCLUSION

8) In closing, the petitioners want to bring the following facts to the attention of this Honorable Court:

1) Defendant Eisele, in filing his "Motion to

Dismiss" the petitioners Complaint, is taking it upon himself to act on all the defendants behalf by making statement's on their behalf which are the acts of a lawyer. Since he is acting in a lawyer's capacity, he is giving the District Court for the District of Columbia jurisdiction to hear the petitioners Complaint.

9) Furthermore, defendant Eisele is attempting to argue this action before the Court has made any decisions on the complaint or its issues. Defendant Eisele cannot be dismissed except by the Grand Jury or Petit Jury. We, the petitioners will not argue this complaint at this time until the Court decides on how to proceed in this complaint. Defendant Eisele has opened the door for litigation not only in this complaint but also in the petitioners, Wendell-David; Williams, petition to the United States District Court for the Eastern District of Arkansas and the original cause number 4:04CR00011-01 GTE, by placing the petitioners file in this courts records. The petitioners are ready to argue any and all of the causes involved in this complaint as well as their other petition's and original causes.

10) This Court is the proper venue for this complaint and they have jurisdiction over the defendants to proceed. The petitioners have placed before the court a complaint which in fact relief can be granted. Due to the above reasons stated and evidence enclosed, the petitioners ask that this Honorable Court **QUASH** defendant Eisele's "Motion to Dismiss". The petitioners contend that there are petitioners and defendants as yet unnamed too numerous for defendant Eisele's motion to hold merit and by filing the petitioners, Wendell-David; Williams file, he is attempting to PREJUDICE this Honorable Court against the petitioners.

Submitted this 26th Day of December 2007

Locus Sigilli: [signature]

complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Haines, supra, at 520–521, 30 L Ed 2d 652, 92 S Ct 594.[7] And, of course, the allegations of the complaint are generally taken as true for purposes of a motion to dismiss. Cruz v Beto, 405 US 319, 322, 31 L Ed 2d 263, 92 S Ct 1079 (1972).

**[1b]** Applying these principles to petitioner's amended complaint, we conclude that all but one of its allegations were properly dismissed for failure to state a claim. Petitioner's allegations of bias and procedural irregularities in the September 22 hearing, unequal treatment, and cruel and unusual punishment, even when liberally construed, were insufficient to require any further proceedings in the District Court. We therefore affirm the dismissal of these claims.

Petitioner's allegation that he had been confined unnecessarily to segregation is of a different character. It can be construed as a contention that his confinement to segregation violated due process because it took place without a prior hearing. It is clear from the facts alleged in the amended complaint that petitioner was confined in segregation for two days before a hearing was held. Indeed, petitioner expressly stated this claim in procedural due process terms in his response to the defendants' motion to dismiss the amended complaint.[8]

**[449 US 11]**

**[6]** Segregation of a prisoner without a prior hearing may violate due process if the postponement of procedural protections is not justified by apprehended emergency conditions. See Hayes v Walker, 555 F2d 625, 633 (CA7), cert denied, 434 US 959, 54 L Ed 2d 320, 98 S Ct 491 (1977). The amended complaint alleged that segregation was unnecessary in petitioner's case because his offense did not involve violence and he did not present a "clear and present danger." There is no suggestion in the record that immediate segregation was necessitated by emergency conditions. Defendants did make the unsworn assertion that petitioner

7. The Court reaffirmed the principles of Haines in Estelle v Gamble, 429 US 97, 106, 50 L Ed 2d 251, 97 S Ct 285 (1976):

"As the Court unanimously held in Haines v Kerner, 404 US 519, [30 L Ed 2d 652, 92 S Ct 594] (1972), a pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers' and can only be dismissed for failure to state a claim if it appears ' "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' Id., at 520–521, [30 L Ed 2d 652, 92 S Ct 594], quoting Conley v Gibson, 355 US 41, 45–46, [2 L Ed 2d 80, 78 S Ct 99] (1957)."

8. In a document entitled, "Response to: Motion to Dismiss or For Summary Judgment/& Memorandum in Support of Motion to Dismiss or For Summary Judgment," petitioner alleged:

"*Placement in Segregation:* Plaintiff was placed in Segregation on September 20, 1977, with *no* hearing what-so-ever. No reasons provided him as to *why* it was necessary to place him in segregation. *No* Resident Information Report issued him, stating he was being placed in segregation, under *investigation* status." Response, at 2 (emphasis in original).

Petitioner thereafter asserted that "[c]lassification to segregation must comply with procedural due process." Id., at 4, 7. Petitioner went on to assert that his placement in segregation on September 20 was "completely unnecessary, because plaintiff posed no immediate threat to the safety and security of the institution. . . ." Id., at 8. Later in the response, petitioner discussed his due process claim in detail. Id., at 15–16.



Hughes v. Rowe, 449 US 5, 10, 66 L.Ed.2d 163, 170 n. 7 (1980)

(Exhibit A-1)

Hughes v. Rowe

[9]
S, Petitioner,

rnor, State of Illinois, et al.

92 S Ct 594, reh den
819, 92 S Ct 963

25]

cided January 13, 1972

r

sued state officials pro se in the
itern District of Illinois, seeking
ights and alleging (1) a denial
is solitary confinement and (2)
ary confinement. The District
re to state a claim upon which
States Court of Appeals for the

en Court reversed. In a per
us ews of the court, it was
d doubt that the inmate could
claim which would entitle him
ty to offer proof.

rticipate.

RARY® REFERENCES

5
Pleading § 179

; Pleading
ion, or Declaration; Sen-

; Federal Rules of Civil



## HEADNOTES

Classified to U. S. Supreme Court Digest, Annotated

**Pleading § 130 — pro se complaint**

1. The United States Supreme Court holds allegations of a pro se complaint to less stringent standards than formal pleadings drafted by lawyers.

**Pleading § 130 — failure to state a claim**

2. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

**Civil Rights § 10; Pleading § 179 — solitary confinement**

3. In a suit under 42 USC § 1983, which gives a right of action for the deprivation of civil rights under color of state law, a state penitentiary inmate is entitled to an opportunity to offer proof under his pro se allegations that he was denied due process in the steps leading to his solitary confinement and that in solitary confinement he was forced to sleep on the floor of a cell with only blankets, which aggravated a pre-existing foot injury and a circulatory ailment.

## APPEARANCES OF COUNSEL

**Stanley A. Bass** argued the cause for petitioner.

**Warren K. Smoot** argued the cause for respondents, pro hac vice, by special leave of court.

Briefs of Counsel, p 926, infra.

## OPINION OF THE COURT

**Per Curiam.**

Petitioner, an inmate at the Illinois State Penitentiary, Menard, Illinois, commenced this action against the Governor of Illinois and other state officers and prison officials under the Civil Rights Act of 1871, 17 Stat 13, 42 USC § 1983, and 28 USC § 1343(3), seeking to recover damages for claimed injuries and deprivation of rights while incarcerated under a judgment not challenged here.

[404 US 520]

Petitioner's pro se complaint was premised on alleged action of prison officials placing him in solitary confinement as a disciplinary measure after he had struck another inmate on the head with a shovel following a verbal altercation. The assault by petitioner on another inmate is not denied. Petitioner's pro se complaint included general allegations of physical injuries suffered while in disciplinary confinement and denial of due process in the steps leading to that confinement. The claimed physical suffering was aggravation of a pre-existing foot injury and a circulatory ailment caused by forcing him to sleep on the floor of his cell with only blankets.

The District Court granted respondents' motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief could be granted, suggesting that only under exceptional circumstances should courts inquire into the internal operations of state penitentiaries and concluding that petitioner had failed to show a deprivation of federally protected rights. The Court of Appeals affirmed, emphasizing that prison officials are vested with "wide discretion" in disciplinary matters. We granted certiorari and appointed

(Exhibit A-2)

Pursuant to Fed.R.App.P. 24(a), Gale filed a motion in this Court seeking leave to appeal without prepayment of costs on November 19. On December 11, the Chief Judge ordered the government to respond to this motion. Based upon our review of the record and the government's response, we now grant Gale's motion.

While portions of the complaint are clearly frivolous,[4] it does assert a cause of action under the Privacy Act, 5 U.S.C. § 552a(d)(1) (1976) (access by an individual to his record or to any information pertaining to him). Gale alleges that the Bureau of Prisons has refused to give him documents pertaining to him which are in the Bureau's possession. It is reasonable to expect that the Justice Department's files concerning a prisoner in federal custody[5] will include records of his transfers from prison to court, and nothing in the *complaint* indicates otherwise. The District Court's order contains no explanation other than the notation "See also Civil Action 79–84."[6]

The government's response to Gale's motion does not deny that the complaint states a claim for relief under the Privacy Act. Rather, it argues that this case is moot because the Regional Director of the Bureau of Prisons wrote to Gale in March, 1979, stating that the requested information was not contained in Gale's file. Since Gale's complaint seeks not merely a response to his request but the documents themselves, the case would only be moot if the government had given Gale the documents.

The government's assertion that it does not have these documents raises factual issues which cannot be resolved in this Court. The District Court did not consider this assertion, since it dismissed the action solely on the basis of the complaint. On remand, the government will be free to attempt to prove that it does not possess the documents requested by Gale.

Although Gale's request refers to the documents as those "used by the District of Columbia Court . . . to remove Melvin Gale from federal custody," we do not necessarily agree with his claim that his removal from Lorton to Superior Court constituted a removal from federal custody. We do find that Gale has adequately described the documents used to transfer him. It is clear that Gale was transferred on several occasions pursuant to "come-up" orders issued by the Clerk of the Superior Court at the request of the United States Attorney's office. *See Gale v. United States*, 391 A.2d 230, 232 (D.C.Ct.App.1978), *cert. denied*, 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979). Gale's letter to the Bureau of Prisons specifies the dates of his transfers and states that they were made at the request of the "District of Columbia Court." Mindful of the Supreme Court's admonition that a *pro se* complaint should be held "to less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972), we believe that Gale's letter is understandable as a

4. We perceive no basis for concluding that either the Fifth or the Eighth Amendment grants Gale a right to the documents in question. Furthermore, his claim for damages is meritless since the statutes upon which he relies do not provide a monetary remedy. The Freedom of Information Act does not create a cause of action for damages, and the provision of the Privacy Act which allows an individual to recover damages does not apply to an agency's failure to furnish records that have been requested. *See* 5 U.S.C. § 552a(g)(4) (1976).

5. Although Gale was taken to Lorton after his conviction in the District Court, he remained in the custody of the Attorney General of the United States pursuant to 18 U.S.C. § 4082 (1976).

6. This refers to an action brought by Gale in the District Court in January, 1979, which alleged that the transfers between Virginia and the District of Columbia deprived him of various constitutional rights. Gale sought a declaration that the transfers were unauthorized, vacation of his sentences and dismissal of the indictment or a new trial, and compensatory damages for each day of his confinement after the first transfer. This action was dismissed by the District Court as frivolous, and Gale did not appeal. The District Court may have interpreted Gale's complaint in the present case as making similar claims. Since Gale is seeking documents, however, his complaint states a claim that was not made in Civil Action 79–84.

Gale v. U.S. Dept. of Justice, Fed. Bur. of Prisons, 628 F.2d 224, 226 (D.C. Cir., 1980)
TRUE, CORRECT AND COMPLETE PHOTOCOPY OF THE ORIGINAL

(Exhibit A-3)

Petitioners' habeas corpus petitions, and in so doing, violated the Federal Racketeering and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). To sustain a RICO claim, Petitioners must allege at a minimum that Defendants have engaged in a "pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962. The Complaint alleges conduct that is entirely lawful–that Defendant Eisele considered and denied Petitioner Williams' habeas corpus petition. Such an allegation does not give rise to any inference of impropriety, much less evidence a conspiracy involving a pattern of racketeering activity. *See Chisum v. Colvin*, 276 F. Supp. 2d 1 (D.D.C. 2003). Further, Plaintiffs have failed to allege that they have been injured in their business or property by reason of a violation of section 1962. 18 U.S.C. § 1964(c). Therefore, Petitioners' Complaint should be dismissed for failure to state a claim.

## III. Petitioners' Complaint is Barred by Judicial Immunity

Generally, a judge is immune from a suit for money damages. *Mireles v. Waco*, 502 U.S. 9, 9-10, 112 S.Ct. 286, 287 (1991) (citing cases). However, the Court noted that a judge is not absolutely immune from criminal liability, from a suit for prospective injunctive relief, or from a suit for attorney's fees authorized by statute." *Id.* at 10 n.1 (citing cases). "Although unfairness and injustice to a litigant may result on occasion, 'it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.'" *Id.* at 10 (quoting *Bradley v. Fisher,* 13 Wall. 335, 347, 20 L.Ed. 646 (1872)).

(Exhibit B-1)

"Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Id.* at 11. "Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Id.* Judicial immunity is overcome in only two sets of circumstances: (1) a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity; and (2) a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction. *Id.* at 11-12.

"[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Id.* at 12 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 1108, 55 L.Ed.2d 331 (1978)). "If judicial immunity means anything, it means that a judge will not be deprived of immunity because the action he took was in error or was in excess of his authority." *Id.* at 12-13 (internal quotations omitted). "[T]he relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.'" *Id.* at 13.

Here, Judge Eisele's action of denying Petitioner Williams' motion was taken in his judicial capacity. Furthermore, Mr. Williams filed the motion before Judge Eisele, which Judge Eisele denied based upon lack of personal jurisdiction. However, Judge Eisele had jurisdiction to so rule. Therefore, there was not a complete absence of all jurisdiction, and Petitioners' Complaint is barred by judicial immunity.

(Exhibit B-2)

*v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940)). The defendant's conduct and connection with the state must be such that the defendant should "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). The defendant's acts must be substantial enough to give clear notice that it would be subject to suit in the forum state. *Id.* However, the unilateral activities of one claiming some relationship with the non-resident defendant is not enough to satisfy the minimum contacts requirement. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). It is essential in each case that there is some act by which the "defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* Where a forum state seeks specific personal jurisdiction over a non-resident defendant, due process is satisfied if "the defendant has 'purposely directed' his activities at residents of the forum ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (citations omitted).

**[13, 14]** In conjunction with those basic principles of due process, this court applies a five-factor test in analyzing the constitutional requirements needed for personal jurisdiction: (1) the nature and quality of defendant's contacts with the forum state; (2) quantity of contacts; (3) source and connection of the cause of action with those contacts;[4] and to a lesser degree, (4) the interest of the forum state; and (5) the convenience of the parties. *Northrup*, 51 F.3d at 1388; *Land-O-Nod*, 708 F.2d at 1340; *Aftanase v. Economy Baler Co.*, 343 F.2d 187, 197 (8th Cir.1965); *see also Aaron Ferer & Sons Co. v. American Compressed Steel Co.*, 564 F.2d 1206, 1210 n. 5 (8th Cir.1977). The district court analyzed National's contacts in light of these factors and concluded National had sufficient minimum contacts with Minnesota. In our review, we also find that Minnesota properly has personal jurisdiction over National.

**[15]** First, National argues that Pappajohn's unilateral efforts as a director cannot be considered when analyzing the contacts between National and Minnesota because he was not the aggressor in the business relationship and had no authority to act on behalf of National. The district court found that it was "clear and uncontroverted" that Pappajohn was the aggressor in the relationship and initially solicited Kessler's services. Both parties in sworn affidavits, however, attest that it was the other one who initiated the first contact concerning the contract at issue. It is undisputed that Pappajohn knew Kessler when Kessler was previously employed at Smith Barney in New York. Pappajohn asserted that Kessler solicited his business with National at this time if a future opportunity ever arose where his services were required. Kessler stated that in the spring of 1992, Pappajohn called to discuss a potential merger National was considering and that the company needed a fairness opinion to present to its shareholders to justify the merger. Pappajohn does not dispute that the conversation took place, but contends that it was only made in response to Kessler's previous solicitation. Without having to stipulate who initiated the contact, the record is clear that after this contact National aggressively pursued a business relationship with Wessels. Viewing the facts in the

4. Whether the jurisdiction is specific or general will distinguish the relationship between the cause of action and the contacts. *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir.1994). Specific jurisdiction is jurisdiction over causes of actions arising from or related to the defendant's actions in the forum state. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). General jurisdiction refers to the power of a state to adjudicate any cause of action regardless of where the cause of action arose. *Id.* The contacts involved in the present action are related to the dispute that resulted in this suit, and therefore the inquiry is one of specific, and not general, jurisdiction. *See also Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1392 (8th Cir.), *cert. denied*, — U.S. ——, 114 SCt. 63, 126 L.Ed.2d 32 (1993).

TRUE, CORRECT AND COMPLETE PHOTOCOPY OF THE ORIGINAL
Wessels, Arnold & Henderson v. Nat. Medical Waste, 65 F.3d 1427 (8th Cir., 1995)

(Exhibit C-1)

.2d at 1340; *Afta-* Co., 343 F.2d 187, so A... Ferer & upre... Steel Co., th Cir.1977). The tional's contacts in concluded National ntacts with Minne- so find that Minne- l jurisdiction over

rgues that Pappa- s a director cannot yzing the contacts nnesota because he the business rela- rity to act on behalf court found that it erted" that Pappa- in the relationship Kessler's services. affidavits, however, er one who initiated ing the contract at at Pappajohn knew was previously em- in New York. Pap- essler solicited his this... if a future where his services stated that in the n called to discuss a al was considering eded a fairness opin- areholders to justify n does not dispute ook place, but con- nade in response to ation. Without hav- ated the contact, the this contact Nation- a business relation- wing the facts in the

adjudicate any cause of re the cause of action involved in the present dispute that resulted in the inquiry is one of , jurisdiction. *See also* , 985 F.2d 1389, 1392 U.S. ——, 114 SCt. 63,



light most favorable to National, National could have declined Kessler's solicitation, but instead actively pursued a business relationship. Further, after Pappajohn and Kessler had assessed the situation, National's president, Embry, began negotiations with Kessler concerning a contract. Although unclear who made the phone call, what is clear is that National pursued a business relationship with Wessels and the district court's finding to this effect is not clearly erroneous.

[16] Collateral to this argument, National contends that Pappajohn was not an agent of the corporation and his actions were unauthorized. The district court found that it was irrelevant whether Pappajohn was an agent of National or not because National clearly ratified his actions. National contends that there is no law to support the finding that the unauthorized actions of a director can bind a corporation to a forum state for personal jurisdiction purposes. Both Pappajohn and Embry testified that Pappajohn had no authority to act on behalf of National. The issue of whether Pappajohn had authority to act or not, however, becomes irrelevant when the record is clear that National supported, accepted, and followed through on the efforts initiated. Under Minnesota law, it is well established "that a principal cannot accept the benefits of the agent's unauthorized conduct and then deny liability based on the fact that the conduct was unauthorized." *Centennial Ins. Co. v. Zylberberg,* 422 N.W.2d 18, 21 (Minn.Ct.App.1988) (citing *Swanson v. Domning,* 86 N.W.2d 716, 721 (Minn.1957)). Although contacts for personal jurisdiction are different from a principal's liability for an agent's unauthorized conduct, the same analysis is applicable. Here the record clearly revealed that once the contact was initiated, Embry went forward with negotiations and eventually consummated an agreement for Kessler's services. National accepted and ratified Pappajohn's efforts whether Pappajohn officially had the authority to act or not. National cannot now deny Pappajohn's authority to act on behalf of the corporation when it has already accepted the benefits of Wessels' services. The district court's finding that National ratified Pappajohn's actions is not clearly erroneous and therefore Pappajohn's contacts with Minnesota are relevant.

National also argues that the mail and telephone contacts are insufficient to confer personal jurisdiction on National. As the district court correctly asserted, these contacts alone are insufficient to confer personal jurisdiction, but remain a consideration in determining whether the defendant purposely availed himself of the privilege of doing business in Minnesota. *See Wines,* 846 F.2d at 43; *Institutional Food Mktg. Assoc. v. Golden State Strawberries, Inc.,* 747 F.2d 448, 456 (8th Cir.1984); *Mountaire Feeds, Inc v. Agro Impex, S.A.,* 677 F.2d 651, 656 (8th Cir.1982). It is evidence of a continuous, systematic business relationship. Here all correspondence was directed to Wessels in Minnesota where the majority of the work under the contract was to be performed. Kessler testified that 90 percent of the work was performed in Minnesota. Aside from two outside visits to New York and Tennessee, the record supports that the majority of work required under the contract was performed in Minnesota. As the United States Supreme Court noted in *Burger King:*

> Jurisdiction ... may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. *Keeton v. Hustler Magazine, Inc.,* [465 U.S. 770, 774–75, 104 S.Ct. 1473, 1478–79, 79 L.Ed.2d 790].

*Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184. Although the absence of physical presence within the state cannot defeat jurisdiction, in addition there were two occasions when Pappajohn visited Minnesota in relation to the contract. In October 1992 and in

TRUE, CORRECT AND COMPLETE PHOTOCOPY OF THE ORIGINAL

(Exhibit C-2)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**CV-1:07-02039**

| | | |
|---|---|---|
| Edward Craig; Poole, et al.,<br>Petitioner/Plaintiff,<br>v.<br>John M. Roll, et al.,<br>Respondent/Defendant. | )<br>)<br>)<br>)<br>)<br>) | CERTIFICATE OF SERVICE |

The enclosed "Motion to Quash" has been served via First Class United States Mail to the following:

Clerk of the Court
United States District Court
for the District of Columbia
333 Constitution Avenue N.W.
Washington, District of Columbia
[20001]

Garnett Thomas Eisele
c/o 600 West Capitol Street
Little Rock, Arkansas state
[72201]

Submitted this 7th day of January 2008

Locus Sigilli: Wendell D. Wille